## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 23-cr-392 (JEB)** |
| | ) | |
| **CHRISTOPHER RODRIGUEZ** | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Grief, anger, and confusion…those were the feelings overwhelming Christopher Rodriguez when he took the actions at issue in this case. These actions are completely at odds with Mr. Rodriguez's upbringing and lifelong character. They were the result of profound personal loss and a sincere belief that the Chinese government was to blame for his loss. Mr. Rodriguez now finds himself in the position of his former clients, accepting responsibility for his actions and experiencing the criminal legal system from an unfamiliar position. Mr. Rodriguez respectfully submits the following for the Court's consideration in determining an appropriate sentence based on the sentencing factors set forth in 18 U.S.C. § 3553(a). Mr. Rodriguez respectfully requests that the Court impose a sentence of seven years incarceration.

### I.  PROCEDURAL HISTORY

On August 2, 2024, Mr. Christopher Rodriguez entered a plea of guilty pursuant to a Rule 11(c)(1)(C) plea to a three count Information charging him with damaging property occupied by a foreign government, in violation of 18 U.S.C. § 970(a), malicious damage to federal property, in violation of 18 U.S.C. § 844(g), and receipt and possession of an unregistered firearm (destructive device), in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. *See* Superseding Information, ECF No. 51. The Rule 11(c)(1)(C) plea agreement states that Mr. Rodriguez and the government agree

to a sentencing range of 7-10 years.  He will appear before this Honorable Court for sentencing on March 14, 2025.

## II.  LEGAL STANDARD

When imposing a sentence, the Court must consider several factors, including (1) the United States Sentencing Guidelines; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct, along with the kinds of sentences available; and (5) the need to avoid unwarranted disparities.  *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

*See* 18 U.S.C. § 3582 (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  18 U.S.C. § 3553(a) (emphasis added).

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall*, 552 U.S. at 50.

Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

### III. OBJECTIONS TO THE PRESENTENCE REPORT[1]

Mr. Rodriguez objects to the inclusion of XL Specialty Insurance Company and/or the Miss Mao sculpture as a victim of any of the offenses of conviction. First, 26 U.S.C. §§ 5841, 5861(d), and 5871 are not offenses which carry mandatory restitution under § 3663A(a)(2) or discretionary restitution under § 3663(a)(2). The government agrees with this conclusion. ECF No. 70 at 27. Second, restitution is not appropriate under USSG 5E1.1, because restitution under the sentencing guidelines is still limited to that which "otherwise meets the criteria for an order of restitution under [§ 3663]." USSG 5E1.1(a)(2). XL Specialty Insurance Company is not a "victim" as defined in § 3663(a)(2) as it was not directly and/or proximately harmed as a result of the commission of any of the offenses contained in the superseding information to which Mr. Rodriguez pled guilty and the plea agreement did not otherwise expand the restitution to cover all relevant conduct.

---

[1] Mr. Rodriguez joins the government's objection related to grouping under the Guidelines. Under U.S.S.G. § 3D1.2(d), offenses covered by §§ 2B1.1 and 2K2.1 group.

Restitution under the Sentencing Guidelines, like restitution under § 3663, is limited to damages either caused as a result of the offense of conviction or that are "agreed to by the parties in a plea agreement."  18 U.S.C. § 3663(a)(1)(A); *see also Hughey v. United States*, 495 U.S. 411, 413 (1990) ("We hold that the language and structure of the Act make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction."); *United States v. Udo*, 795 F.3d 24, 33 (D.D.C. 2015) ("[T]he relevant statutes do not even contemplate—much less expressly allow—that a court may order a defendant to pay restitution for offenses related to, but distinct from, the offenses of conviction."); *United States v. Dorcely*, 454 F.3d 366, 377 (D.C. Cir. 2006) ("We believe the reasoning of *Hughey* applies with equal force to section 3663 and conclude that restitution under 18 U.S.C. 3663(a)(1) may be ordered only 'for the loss caused by the specific conduct that is the basis of the offense of conviction.'" (quoting *Hughey*)); *United States v. Gordon*, 480 F.3d 1205, 1211 (10th Cir. 2007) ("The MVRA, which amended the VWPA in 1996, did not change the general rule that restitution may only be ordered for losses caused by the offense of conviction."); *United States v. Thomas*, 862 F. Supp. 2d 19, 21 (D.D.C. 2012).

The government argues that because the damage to the Miss Mao statute was included as potentially relevant conduct and used to increase the sentencing Guidelines in the plea agreement, the damage was a result of the offense of conviction, namely receipt and possession of an unregistered firearm.  However, restitution is limited to the actual offense of conviction and does not extend to relevant conduct unless restitution is expressly written into a plea agreement.  *See United States v. Silkowski*, 32 F.3d 682, 689-90 (2d Cir. 1994) ("Where the issue is the amount of loss to be repaid by a defendant under a restitution order, however, the scope of conduct that a district court may consider in determining the amount of loss is governed by different

4

considerations than those set forth in the relevant conduct provision of the Guidelines. . . . At a minimum, the district court could only order restitution for losses that [defendant] either expressly agreed to or directly caused by the conduct composing the offense of conviction."); *United States v. Benns*, 740 F.3d 370, 378 (5th Cir. 2014) ("the district court erred by awarding restitution based on relevant conduct that went beyond Benns' offense of conviction. Moreover, an award of restitution based on losses not resulting from the offense of conviction is an error that is clear and obvious."). The relevant conduct for calculating the Sentencing Guidelines is not the same conduct the Court considers in determining if restitution is appropriate.

Restitution for the Miss Mao statue is not warranted or proper. Mr. Rodriguez did not plead guilty to, nor was he convicted of, harming, damaging, or destroying the Miss Mao sculpture and none of the three counts to which he did plead guilty relate to an offense against the Miss Mao sculpture, the property of its creators, or the pay-out by XL Specialty Insurance Company. Furthermore, Defendant's plea agreement does not include an agreement to any additional restitution outside of that permitted by statute.

Additionally, when determining whether to award restitution pursuant to § 3663, the Court must consider "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i)(II). Because restitution under the Sentencing Guidelines must meet the criteria of § 3663, the Court should also consider Mr. Rodriguez's ability to pay restitution here. Mr. Rodriguez is 45 years old. Even with the seven-year sentence requested here, he will be in his 50s when he is released from incarceration. Upon his release, he will have to find a new career path and new way to support himself, as he will not be able to return to his life as an attorney. As the Court is well aware, individuals with felony criminal records face

countless collateral consequences, including extreme challenges in finding employment upon release. Even when someone does succeed in finding employment, they are rebuilding their life from scratch, saving enough money to afford housing and pay bills. Adding restitution on top of those challenges creates unnecessarily harsh penalties in this case.

Mr. Rodriguez does not have significant financial resources to pay restitution at this time and he will face all of the challenges individuals with felony criminal convictions face upon release. "When people are not able to immediately pay off their obligations, 'poverty penalties,' such as interest and collection costs, are imposed, further ballooning criminal debt. Restitution orders have lasting consequences even for those who manage to find the money to pay off their obligations, affecting their ability to build income, attain housing stability, and generally support themselves and their families." Lula Hagos, *Debunking Criminal Restitution*, 123 Mich. L Rev. 3, 476-77 (Dec. 2024); *id*. at 495-69 ("Restitution in criminal courts directly undermines the necessary steps for defendants to successfully reenter society. Because the overwhelming majority of those involved in the criminal system are indigent, the imposition of restitution shackles defendants long after they serve their sentences."). Mr. Rodriguez's current and prospective financial situation do not justify restitution in this case. That is especially true where the party seeking restitution is an insurance company, not an actual victim. "Insurance companies . . . receive 'double compensation' under the current scheme as they receive a payment from defendants and premiums from their customers." *Id*. at 511. The requested amount of restitution is discussed below, but notably, the insurance company does not offset its request by any premiums received from the customer, thus preventing the Court from even determining an appropriate amount of restitution. Restitution is not warranted in this case and Mr. Rodriguez asks the Court not to impose any amount of restitution.

Even if the imposition of restitution was permitted and appropriate, which defendant denies, the amount of the loss claimed is not. The statue's insured value, Ex. 1, Commercial Fine Art Declarations, as well as the settlement pay-out amount, Ex. 2, Adjuster's Report, were not the product of an arms-length appraisal of the sculpture's value and/or the cost of repairing the damages suffered on or about November 5 to 7, 2022. To the contrary, both were based upon a self-serving agreement of the parties. Ex. 1, Commercial Fine Art Declarations; Ex. 2, Adjuster's Report. The artist and consignees sought to insure profits of an aspirational sale and the insurance company, presumably, got to collect a higher premium. Ex. 6, Adjuster's Initial Report at 7.

On December 6, 2021, a consignment agreement was executed whereby the Gao Brothers sought to exhibit and sell a steel sculpture titled *Miss Mao Trying to Poise Herself at the Top of Lenin's Head*. Ex. 3, Consignment Agreement. An aggressive $650,000.00 sales price was set by the parties thereto, whereby the Gao Brothers would receive 50% (presumably including their profit from the sale) and the consignees would split the remaining 50% in the event of a sale. *Id.* at ¶ 2. Despite the ambitious sales price, or perhaps because of it, or perhaps because of the presence of pre-existing damage, the market did not meet the selling price set by the parties. Among the documented pre-existing damage, the statute evidenced "rusted interior supports (…) caused by standing water." Ex. 4, Condition Report Memo. A post-assembly external assessment, conducted by Art Conservation Services, revealed "numerous 'scuff marks', scratches, surface accretions of unknown substances, rust stains and one prominent area where apparent impact to the surface gouged through the reflective metallic finish leaving the underlying metal exposed and rusting." Ex. 5, Art Conservation Services Assessment.

Even when the adjuster's initial report recognized that the steel inner support system of the sculpture was in poor condition, prior to the incident, the adjustment proceeded under the incorrect

assumption that "the explosion knocked the upper sections of the piece out of alignment" and the speculative belief that "it likely damaged the (already damaged) steel inner support system of the sculpture." Ex. 6, Adjuster's Initial Report at 2.  Pictures taken prior to the incident demonstrate (1) that the middle structure of the sculpture was already misaligned, Ex. 5, Art Conservation Services Assessment at 13, 14, 19 and 31, and (2) that pre-existing corrosion shavings had dropped off some support beams in the interior support structure.  Ex. 4, Condition Report Memo at 9.  The adjuster's reliance on the post-assembly external assessment by Art Conservation Services, as the basis to conclude that "the piece … was in very good overall condition," is also misplaced.  Art Conservation Services' report was limited to an external evaluation and, without the benefit of having inspected the hollow interior, the drafters conceded that they "did not know precisely" how the sculpture's sections were connected.

Furthermore, the adjuster's reliance on the Gao Brothers' self-serving claim that the sculpture was a total loss should be similarly unpersuasive.  Such a conclusion was based on the unproven contentions that: (1) the sculpture was fabricated in a foundry in Beijing that was no longer in business; (2) the creation was complex and required scaffolding due to it being approximately 25' tall; and (3) the full-scale fiberglass model was destroyed after the sculpture was finished.  The total loss determination belies the fact that post incident pictures of the statute show damage akin to a traditional fender bender.  Ex. 7, USAO_067094.  Comparisons of before, Ex. 8, Pictures Before, and after, Ex. 5, Art Conservation Services Assessment at 31, pictures do not sustain a conclusion of $360,000.00 in damages.  Surely the original artists, or even home-grown metal sculptors, could have repaired the bottom sections for far less.  The cost of using scaffolding to maintain the sculpture was estimated at $1,000.00.  *Id.* at 4.  Nevertheless, no formal

appraisal of the sculpture or estimate of repairs was produced, despite a subpoena for the "entire file" being served upon XL Specialty Insurance Company.

There is no evidence of any attempt to offset the estimated damages or justification for a "total loss" finding. For example, the pay-off amount does not contemplate or subtract the sculpture's resale value after repairs or as scrap metal. Furthermore, there is nothing unique reported about the since-closed foundry where parts of the sculpture had originally been manufactured. And preexisting damage to the piece from "water… able to penetrate the piece and the inner support system" made any loss difficult to accurately calculate. Ex. 6, Adjuster's Initial Report at 5. Therefore, the $360,000.00 pay-out does not reflect XL Specialty Insurance Company's actual loss.

As indicated in the Presentence Investigation Report, "based upon defendant's financial profile, it does not appear he has the resources to pay a fine (or) any restitution (if) ordered in this case." ECF No. 61 ¶ 114. Imposing a discretionary fine or restitution upon the defendant will, therefore, serve as a serious impediment to his eventual reintegration into and involvement in society.

In the alternative to all of the above, and in light of the fact that the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order and would not allow for the payment of a restitution order in the foreseeable future, defendant prays that any restitution be limited to nominal periodic payments under U.S.S.G. § 5E1,1 (f).

## IV. 3553(A) FACTORS

Mr. Rodriguez fully accepts responsibility for the conduct in this case. As Bryan Stevenson put it, "Each of us is more than the worst thing we've ever done." Bryan Stevenson, *Just Mercy: A Story of Justice and Redemption* (2014) at 17-18. Mr. Rodriguez is so much more than this

conviction, he is so much more than his criminal record, and he deserves an opportunity to prove that to himself. A sentence of seven years would adequately account for the § 3553(a) factors.

## A.  History and Characteristics of Mr. Rodriguez.

Christopher Rodriguez's defining quality is that he is a true public servant. All of the jobs that he has chosen in his life share a common thread—the mission has been to help others. His desire to serve others has been evident since his first major life choice—his decision to enlist in the Army upon graduating from college. Even within the Army, he focused on helping those in need. After boot camp, he became a Mental Health Specialist, a position designed to help mental health professionals administer care to soldiers. https://www.goarmy.com/careers-and-jobs/science-medicine/physical-mental-health/68x-behavioral-health-specialist. In the Army, he was deployed to Iraq. He and his battalion were central to the United States' misguided searches for individuals responsible for 9/11 and for Weapons of Mass Destruction. By the end of his service, Mr. Rodriguez had worked as an investigator in Germany and then was detailed in the Secretary of Defense's security unit. While he learned much in his military service, Mr. Rodriguez could not help but develop a sense of distrust upon the realization that his government had taken advantage of him and his fellow soldiers.

His experience in Iraq did significant damage to Mr. Rodriguez's wide-eyed idealism. He had been exceptionally motivated to do something meaningful after 9/11. With strong ties to New York and coming from an exceptionally patriotic family, 9/11 felt personal to him. Mr. Rodriguez felt compelled to act and did everything in his power to serve his country. In the end, he recognized that the American people were limited, not in their willingness or in their capacity, but in their knowledge and information. America was limited because, for whatever strategic reason, the government had been withholding critical information from the people. He recognized that the

10

government had not been entirely honest with its citizens, and it turned him into a much more critical and even skeptical thinker. But, most importantly, it never made him dangerous, violent or harmful. Mr. Rodriguez, in all of his actions, took extreme care to make sure no one would be harmed.

To understand the Christopher Rodriguez that committed these serious crimes requires understanding who he was before and after the pandemic. It is undeniable that Mr. Rodriguez was an exceptionally interesting man when the pandemic struck. A decorated veteran. Law enforcement Special Agent in the Army. Personal security for the Secretary of Defense Robert Gates. Mental Health Specialist. Former Public Defender. Active Kiwanis Club contributor. Through all of these roles, the constant is that he has been a man of action. After 9/11, while the country mourned, Mr. Rodriguez acted, withdrawing his deferral and joining the Army. When he went to law school and learned about the theories underlying the criminal justice system (that he had been a part of as a criminal investigator), he became a public defender. Christopher Rodriguez was never one to stand on the sidelines, or even to play a supporting role. But then COVID happened. And then his dad died.

At some point prior to COVID, Mr. Rodriguez grew very skeptical of both the Chinese Communist Party and the U.S. government's apparent lack of transparency about the threat posed by the Chinese Communist Party. Looking back, he does not attribute it to a single moment or experience, but his time in the military certainly exposed him to a growing weariness of China's international menace. His fly on the wall experience for the Secretary of Defense certainly had an impact. By the time he left the military, Mr. Rodriguez became determined to educate himself about the spreading Chinese influence in the United States.

When COVID happened, everything seemed to come to a head. That the initial infections came from Wuhan, China, led to the now accepted theory that the virus had been created at the Wuhan Institute of Virology and had leaked, either intentionally or unintentionally. Misinformation from China and an initial worldwide lack of transparency fed people's fears. Mr. Rodriguez's general distrust of government entities and his antipathy towards the Chinese Communist Party fueled his suspicions.

About a year into the pandemic, but only a few months after vaccines first became available, Mr. Rodriguez's father died of a heart attack. Mr. Rodriguez and his father were extremely close. To this day, his eyes well at the mention of his dad.

Mr. Rodriguez was not in Puerto Rico when his father suffered the heart attack and he was deprived of the opportunity to say goodbye. His father's death was sudden and shocking and like so many deaths during the pandemic, closure was very difficult to accomplish. Plus, he was convinced that the heart attack was caused by the vaccine his father had just received. The next couple of months were marred by anger, grief and frustration. As he mourned, he thought of what he could do to address the injustice done to his father—an injustice that was resulting in millions of deaths across the world. And while the international community was focusing on vaccines or treatments or masks or distancing, no one seemed to care that the pandemic was further evidence of the nefarious power and influence of the Chinese Communist Party.

Then, the devastation hit home. When Mr. Rodriguez returned to Florida, after his father's funeral, he was unmoored. He quit his public defender job, packed his car with all of his belongings and drove, without telling anyone where he was going. He had national parks in mind but no specific destination. He went west.

Although he was licensed to carry the firearm he had with him (along with all of his other belongings), he was not specifically licensed in California. He also had with him exploding targets and numerous household items that people do not normally drive with, unless they are, literally, travelling with all of their belongings.

After his arrest, Mr. Rodriguez began to emotionally rebound. He found a job at a private criminal defense firm and began to refocus on helping people at work. Still, he struggled with his grief and the loss of his father. He directed his energy towards publicizing the lesser-known truths about the Chinese Communist Party and he pursued different media strategies to gain widespread engagement. He started collecting and developing content. He became obsessed with his project and would sleep less and less as he became more and more determined to find answers to address his grief and pain.

It is important to recognize that throughout all this, Mr. Rodriguez may have lost perspective, but he never lost his sense of morality. He has always taken great care to make sure that no one would be injured by his actions. That is why his actions, however objectively reckless, were done in the dead of night. And it is why he made sure that the area was deserted. That is why, in the District, when he realized that he could not see oncoming traffic, he repositioned the firing nest and moved the target to make sure that he would not accidentally shoot or harm an innocent passerby. It is why he abandoned his effort when he did not feel he could be 100% certain that he could execute his plan safely.

Mr. Rodriguez feels strongly that the Chinese Communist Party poses enormous danger to the world and still believes that the world is woefully uninformed about the threat it poses. With his actions, he wished to bring attention to the Chinese Communist Party's lurking danger. Nevertheless, he now understands and acknowledges that his methods were unreasonable and

outside the boundaries of the law.  He should have known better, and he is sorry.  But he knew that his actions would not hurt anyone.

Mr. Rodriguez's time in detention has allowed him to refocus on the most important of his priorities—his family.  *See* Ex. 9, Letters in Support; Ex. 10, DOC Certificates; Ex. 11, Free Minds Letter and Poems.  He is extremely grateful for the support his family has provided him and has especially realized that his actions foolishly and selfishly came at the expense of the emotional well-being of his mother.  He worries every day that he will not be present to help his mother if she becomes sick, falls down or otherwise needs his help.  He is the son that she depends on and his actions have caused her inordinate grief.

**B.  The Nature and Circumstances of the Offense.**

Mr. Rodriguez recognizes the seriousness of his conduct and accepts full responsibility for his actions.  The decisions he made in November 2022 and September 2023 were completely at odds with his character and the life he lived and built prior to his father's death in 2020.  While the grief that Mr. Rodriguez was experiencing in no way excuses his conduct, and Mr. Rodriguez would never attempt to argue that it does, it does provide some explanation and context for why he veered so far off course.

As Ms. Smyth described, Mr. Rodriguez was likely suffering from Prolonged Grief Disorder.  Ex. 12, Smyth Report at 12-13.  He was struggling with insomnia and became obsessed with his fear of Chinese influence on America.  *Id*. at 12.  He found likeminded people online and spent hours watching videos that only increased his concern and caused him to believe that he needed to do something to raise awareness.  He needed to shine a light on the Chinese influence that he believed to be harmful to the United States, harmful to the country that he fought for and loves.  "The combination of prolonged grief and evidence of hypomania causing sleeplessness,

coupled with his preexisting concerns over the Chinese Communist Party were a breeding ground for deep seeded fear and disdain that Chris delved deeper into each day.  He explained, 'I felt that so much about what we were told in life was a lie, and I wanted to pull back the curtain.'  He went on to say, 'I felt that some level of justice in acknowledging this reality was warranted.'"  *Id*. at 14.

Mr. Rodriguez's choice of protest venues signified the influence against which he was protesting.  "At no point in Chris' plan to demonstrate against the Chinese Communist Party's influence in America, did he ever plan to physically harm anybody.  On the contrary, he intentionally timed his actions to ensure that no person would be harmed.  While this in no way excuses his actions and is not meant to justify how he attempted to raise awareness of Chinese Communist Party's illicit influence in America, it is critical to note that no person was harmed, and that no person was ever intended to be harmed.  Of his choice to use Tannerite, Chris explained, 'it is very loud and can cause damage when used in certain ways, but my intention was for demonstration, not destruction.'"  *Id*.

Mr. Rodriguez's understanding of Tannerite is confirmed by former ATF Explosives Enforcement Officer (1989-2013) and current defense contractor Senior Engineer (2013-Present) David Shatzer's report.  Mr. Shatzer concluded, after conducting test explosions, that the mixture present on September 25, 2023, would not have caused damage to the embassy wall.  Ex. 13, Shatzer Report at 4.  Mr. Shatzer explains in detail why the government's expert report does not accurately describe the damage that could have occurred.

First, the government expert did not actually test the mixture to determine the actual ratio of ammonium nitrate (AN) to aluminum (Al), which is essential in understanding the destructive capabilities of the mixture.  A mixture with a higher percentage of aluminum has greater

destructive capabilities.  Instead of actually calculating the makeup of the substance present on September 25, 2023, the government expert assumed a TNT equivalence of 1 and proceeded to describe the destructive capabilities of TNT.  Not only is that assumption simply a guess, but it is also very likely an incorrect guess.  Commercially available Tannerite mixtures typically have 98 percent ammonium nitrate and 2 percent aluminum, whereas TNT equivalent mixtures are closer to 80 percent ammonium nitrate and 20 percent aluminum.  *Id*. at 4.

Mr. Shatzer's report also refutes the government expert's opinion that fragmentation would occur and cause serious and significant damage.  As Mr. Rodriguez was aware, because of his military experience, Tannerite is a substance that is often used in firing ranges to allow individuals shooting targets from a distance to see if they hit their desired target.  As it is designed to confirm from afar that a target was hit, not to destroy, Tannerite powder expands, creating a *large and visible-from-afar poof* of powder particles and noise, when struck by a projectile from a rifle.  It is the act of containing Tannerite within a solid metal object (like a shell), potentially with shrapnel (like BB's) or with items that can act as shrapnel (any metal that can fragment), that causes damage.  The cloth backpack used by Mr. Rodriguez on September 25, 2023, was not the type of container that would create damaging shrapnel or result in a damaging explosion. Nothing was found inside the unexploded backpack that was designed to act as shrapnel.  As Mr. Shatzer explains, there are no items to fragment and cause the damage described in the ATF report.  The ATF assumption of fragmentation was not based on the actual circumstances present on September 25, 2023.

Mr. Rodriguez does not raise the issue of intended damage in an attempt to excuse or minimize his conduct.  He recognizes that there is inherent danger in firing a gun in a city, notwithstanding his safeguards, and he accepts full responsibility.  "He is clearly remorseful and

has a great deal of insight into himself and into what led to his commission of the crimes for which he has pleaded guilty.  He explained, 'At that time I was obsessed with what I felt was justice. But now I look at it and see that I had a childish plan with adult resources.'"  Ex. 12, Smyth Report at 14.

Mr. Rodriguez has destroyed his life because of the choices he made in 2022 and 2023.  He has caused his family extreme pain and may never see his mother alive again, except at BOP visitation.  "Today, Chris is quiet, humble, and contrite.  He has taken time to work through his unresolved grief and he has accepted his father's death and that his father died of a heart attack." *Id*. at 15.  "When asked about deterrence for future crimes, Chris tearfully stated, 'There is nothing I can do to bring my father back. I was so focused on my dad and his death that I forgot about the rest of my family and how my actions would impact them.'"  *Id*.

**C.  The Purposes of Sentencing and the Kinds of Sentences Available.**

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper*, 562 U.S. at 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).  Given Mr. Rodriguez's history and characteristics, a 7-year prison term is a just punishment and is sufficient for individual deterrence, to protect the public, and for rehabilitation.

A 7-year sentence will not create unwarranted sentencing disparities.  Mr. Rodriguez's case is similar to other cases involving protest through means of actual or attempted destruction.  In *United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008), the Ninth Circuit affirmed a 41-month sentence for an individual who participated in a five-year conspiracy to commit arson and other crimes against government and private entities.  Tankersley herself "participated in both an attempted and a subsequently completed arson that destroyed the headquarters building of U.S.

Forest Industries, Inc., a private timber company located in Medford, Oregon." *Id*. at 1102.

Recent cases in this District demonstrate that even the seven-year sentence would be relatively harsh. In *United States v. Jerritt Pace*, 20-cr-104 (RC), the defendant created an improvised destructive device (a container filled with gasoline) and set fire to it on the sidewalk in front of a Metropolitan Police Department police station. As in this case, it was in the early morning hours and, as in this case, it was in protest (though there it was in protest of the George Floyd murder). Mr. Pace was sentenced to 36 months of incarceration despite having accrued 13 criminal history points.

In fact, in somewhat similar cases across the country, individuals have been spared prison time. For example, in *United States v. Guthrie*, the district court sentenced Guthrie to time served (approximately one month) for assisting in the arson of a police car and the vandalizing of other property during George Floyd protests on May 30, 2020. Ex. 72, No. 20-cr-541 (D.S.C. Apr. 8, 2021), ECF No. 31. Likewise, in *United States v. Bartels*, the district court sentenced Bartels to one day in custody and six months in a half-way house for damaging a police car, encouraging others to burn it, and (per the U.S. Attorney) "incit[ing] the largest and most destructive riot in Pittsburgh history since 1968."[8] No. 20-cr-116 (W.D. Pa. Jan. 7, 2021), ECF Nos. 55, 61. In *United States v. Fagundo*, the district court sentenced Fagundo to three years' probation for setting fire to a police SUV while protesting George Floyd's murder. Ex. 73, No. 21-cr-195 (N.D. Ill. July 14, 2021), ECF Nos. 20 & 23; *see also United States v. Sanchez-Santa*, No. 20-cr-480 (VSB) (S.D.N.Y. Feb. 1, 2021), ECF Nos. 1 8, 13 (approving deferred prosecution agreement of 18 U.S.C. § 844(f) arson charge where defendant, in early June 2020, attempted to burn NYPD vehicle with burning cloth).

By contrast, cases where district courts sentenced a defendant prison time involved conduct

far more egregious than in this case, such as the burning of multiple police cars or government buildings, and/or the defendant had a substantial criminal history. *See, e.g.*, *United States v. Robinson*, No. 20-cr-181 (PJS) (D. Minn.), ECF Nos. 92, 108, 109, 120 (defendants succeeded in burning down a *police station*, causing *$12 million* in loss, and *all four defendants had prior criminal convictions*).  The defendants in that case received sentences of 36 months, 41 months and 48 months of incarceration.  *See also United States v. David-Pitts*, No. 20-cr-143 (JCC) (W.D. Wash.), ECF No. 37 (defendant traveled from Alaska to Seattle and then attempted to burn down a *police station* and *trap police officers inside while it burned*); *United States v. Jackson,* No. 20-cr-148 (JLR) (W.D. Wash. Mar. 23, 2021), ECF No. 50, at 5 *(defendant with three prior convictions and three pending burglary cases planned his actions "a full day in advance" and threw Molotov cocktails at two police cars);* United States v. Trapp, No. 20-CR-308 (WFK) (E.D.N.Y. Oct. 5, 2022), ECF No. 60 *(defendant sentenced to 18 months for cutting brake line of NYPD van and committing wire fraud related to COVID relief funds); United States v. Drechsler,* No. 21-cr-6064 (DGL), (W.D.N.Y. Aug. 9, 2021), ECF Nos. 26, 39 *(sentence of a year and a day where Drechsler burned two government cars and participated in the looting of stores and other property on May 30, 2020).* Because Mr. Rodriguez is clearly not similarly situated to the defendants in these cases, the sentences in these cases, together with those cited above, further support a seven-year sentence. *See Dorvee, 616 F.3d at 187 (citing Gall, 552 U.S. at 55).*

In this courthouse, Ashton Nesmith was sentenced to 71 months for throwing a lit Molotov cocktail at an occupied police car.  That sentence, still well under the range here, was more severe because the defendant violated his conditions of release, failed to appear to court and became a loss of contact.  *United States v. Nesmith¸*20-cr-156 (TNM). And even the government's examples support the 7-year sentence requested here.

The government's reliance on *United States v. Rathbun* is unpersuasive. Unlike Mr. Rodriguez, who fully accepted responsibility for his conduct here, Mr. Rathbun went to trial and was convicted by a jury. Mr. Rathbun had thirteen prior convictions, *see United States v. Rathbun*, No. 3:20-cr-30018, Gov't Sent Memo, ECF No. 359 at 8 (D. Mass), and was found to have lied during his testimony at his two trials. A sentence double the length of Mr. Rathbun would create unwarranted sentencing disparities here. Mr. Rodriguez's acceptance and the 2 additional years support a finding that a 7-year sentence would not create unwarranted sentencing disparities.

Similarly, *Reznicek* does little to advance the government's position. First, Ms. Reznicek's statements made clear that she committed her offense to influence government conduct. As discussed above, Mr. Rodriguez did not have those same motivations. Second, Ms. Reznicek's actions caused millions of dollars' worth of damage, an amount in no way comparable to this case. Finally, in affirming the 96-month sentence (24 months lower than the sentence requested by the government here), the Circuit stressed the district court's findings that Ms. Reznicek encouraged others to imitate her actions and that the vandalism "caused a grave risk to others." *United States v. Reznicek*, No. 21-2548, 2022 WL 1939865, *2 (8th Cir. June 6, 2022). Mr. Rodriguez in no way encouraged other individuals to commit any other crime but rather acted to spread awareness to an underinformed public. Moreover, Mr. Rodriguez acted completely alone, and he was meticulous in ensuring that no one would be harmed by his actions.

## V. GOVERNMENT'S PROPOSED DEPARTURES

The government argues for four upward departures in the Guidelines in an attempt to justify its request for a 10-year sentence. These requests are arbitrary – a fact made even more clear by

the haphazard and capricious adjustments made to the government's arguments over the weekend. Nevertheless, none of the departures are appropriate and the Court should decline to apply them.

## A. USSG § 3A1.4 – Terrorism

The government argues for an arbitrary four-level upward departure based on 3A1.4, Application Note 4, which states that a departure would be appropriate in cases that do not involve one of the underlying offenses that justify the terrorism adjustment under the Guidelines if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." USSG § 3A1.4, Application Note 4. Mr. Rodriguez's actions in this case were a form of protest designed to raise awareness, not intended to influence any government or retaliation against government conduct. Therefore, a departure is not appropriate.

Given the grief, anguish, and confusion overwhelming Mr. Rodriguez at the time of these offenses, an upward departure is not warranted here. As Ms. Smyth's report explains, Mr. Rodriguez was dealing with Prolonged Grief Disorder. He was "'stuck' in the cycle of grief." Ex. 12, Smyth Report at 3. "It was in this bereaved and hypomanic mental state, Chris felt compelled to make a statement to the American people about the dangers of the Chinese Communist Party. He wanted to raise public awareness to the ways that Chinese influence were infiltrating America – including in the form of spies and secret police stations." *Id*. Mr. Rodriguez's form of protest might not have been logical, and he admits it was unlawful, but that is what these actions were. They were protests.

The government points to videos and articles about China that Mr. Rodriguez was watching and reading online. The defense agrees that he was obsessed with his fears and concerns about Chinese Communist Party influence in the United States. In multiple parts of his life, Mr.

Rodriguez experienced what he believed to be undue Chinese Communist Party influence or hardship due to actions he perceived to come therefrom. Like many people who become fixated on an issue, he sought out similar voices online. That does not change the ultimate purpose of his actions and the motivations behind them. At no point did Mr. Rodriguez intend to influence either U.S. or Chinese government conduct by his actions, and he was also not retaliating against specific actions. He wanted to raise awareness. He wanted to bring people's eyes towards the presence of Chinese Communist Party spies in the United States and raise awareness about what he believed to be a significant national security threat.

As the government itself acknowledges, prior to sentencing, Mr. Rodriguez's motivations or intentions are not known to the government. Mr. Rodriguez has previously offered to debrief with the government to explain what he had been going through at the time of his actions. The government declined but now complains that it did not know what he was up to. Instead, they replace specific evidence of intent with concern, worry and innuendo. But in other cases where the departure is applied, specific evidence of intent is present. See, e.g., *United States v. Wright*, 747 F.3d 399, 409-410 (6th Cir. 2014) (listing all of the specific statements from three defendants identifying they believed their actions amounted to a terrorist attack and that they intended to influence government or provoke a government response). Even if the government's theory that Mr. Rodriguez's fixation rose to "obsession," obsession does not warrant a terrorism departure. Mr. Rodriguez would agree that he spent much of his time thinking about his father, about the pandemic, and about his concerns with the Chinese Communist Party – but his solution was to promote awareness among others, not act to influence or retaliate against government action. No departure is warranted under 3A1.4.

**B. USSG § 4A1.3 – Inadequacy of Criminal History Category**

An upward departure from Criminal History Category I to Criminal History Category II is not warranted here.  First, the Sentencing Guidelines permit upward departures "if reliable information indicates that the defendant's criminal history category *substantially under-represents* the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  USSG § 4A1.3(a)(1) (emphasis added).  The government's entire argument here seems to be that in Mr. Rodriguez's one prior conviction, these AUSAs would have charged additional offenses and believe that Mr. Rodriguez received too lenient a sentence, thus believing that a single additional criminal history point is warranted.  First, there is no factual basis to support the government's speculative claim.  Alternatively, a single point difference does not qualify as "substantially underrepresents."

Additionally, the guidelines provide specific criteria that might form the basis for an upward departure and none of those criteria are present here.  The government asks the Court to substitute its judgment for the judgment of the Los Angeles judge that sentenced Mr. Rodriguez in 2021.  The government asks the Court to do so even though the Court and the parties do not have direct factual knowledge of the case in order to make appropriate arguments (for example, that the gun was legally registered in Florida).  That is not the purpose of this departure.  None of the factors in § 4A1.3(a)(2) or examples in Application Note 2 involve increasing the criminal history category based on disagreements about the length of prior sentences.  And the government provides no cases or citations to justify a departure on that basis.

Instead, the government cherry-picks quotations from out-of-circuit cases without providing any of the factual context to argue that one prior act of similar criminal activity is an acceptable basis for departure.  The government cites to *United States v. Menn*, 58 F.3d 635, *1

23

(5th Cir. 1995) for the proposition that "*repeated acts* of similar criminal activity are an acceptable basis for departure." (emphasis added). Importantly, in *Menn*, the defendant was already in criminal history category IV, and the presentence report "detailed *extensive criminal history* for which there was *no assessment of any criminal history points*." Brief for the United States, *United States v. Menn*, 1995 WL 17117056, *21 (Feb. 23, 1995) (emphasis added). It was that *extensive*, *unscored* criminal history that caused the court to find the CHC "*substantially underrepresented*" the seriousness of the offense or likelihood of reoffending. The court specifically held that "Menn had 'no remorse' about the crimes he committed, that he did not appear that there was 'any likelihood of [Menn] stopping the kind of con-artistry that [he is] capable of,' and that there was 'absolutely nothing to show any likelihood that [Menn was] going to stop [his] activities.'" *Menn*, 58 F.3d 635, *2. Menn has no similarities to the case before the Court today. One prior conviction, which does score a criminal history point, is not sufficient to justify a departure here.

Finally, the government takes issue with the charging decisions in California, arguing that because the government there chose to allow Mr. Rodriguez to enter a guilty plea to a misdemeanor and he was not charged with a federal offense for possessing mixed Tannerite, the Court should assess an additional point as if Mr. Rodriguez had been convicted of that offense. It is far from clear that such a charge could survive a legal challenge for a product sold at Home Depot or Bass Pro Shops. Moreover, Mr. Rodriguez was charged and convicted for his conduct in June 2021. The fact that the conviction was not for the offense the government would have preferred does not eliminate the conviction itself. This Court should not substitute its judgment or this U.S. Attorney's Office's judgment for the judgment of the charging office in Los Angeles.

## C.  USSG § 5K2.5 Property damage or loss and USSG § 5K2.6 Weapons and Dangerous Instrumentalities

The application of § 5K departures, outside of cooperation, is extremely rare in federal

sentencing. This case does not present one of the rare instances where the Guidelines fail to take into account conduct that would warrant application of an upward departure.

First, the government wants to have its cake and eat it too, arguing both that the four level enhancement for dangerous weapon under the guidelines for Count Three only applies because of the placement by the Miss Mao statue and the intent to cause damage and that the Guidelines do not account for the damage. The Guidelines account for Mr. Rodriguez's actions and no upward departure is warranted.

Second, the weapons and dangerous instrumentalities enhancement does not apply as they would amount to double counting. All three of Mr. Rodriguez's charges specifically involve the possession of a weapon or dangerous instrumentality. As to Count One, under the Probation Office's calculation of the Guidelines, Mr. Rodriguez receives an eight-level increase for possession of a dangerous weapon. Count Two requires the use of explosive materials, thus the Guideline for 18 USC § 844(f) accounts for the existence of a weapon or dangerous instrumentality. The same is true of Count Three, which is specifically a weapons charge, and the Guidelines add two additional levels for also possessing a destructive device. The Guidelines for each count adequately address the existence of weapons or dangerous instrumentalities. The government provides no justification for an additional three-level upward departure.[2]

The government appears to be focused on the fact that a weapon was discharged, but every discharge of a weapon does not automatically justify the application of § 5K2.6. Unlike the government's example (as well as other examples located by defense counsel) no children, or even

---

[2] Like the other departures requested by the government, they select an arbitrary number of levels, providing no explanation, justification, or support for the selected number. Instead, it is clear the government was involved in an outcome-oriented exercise. The government wanted the resulting Guidelines range to include its requested sentence. Selecting a range of 108-135 months, the government apparently worked backwards to determine the necessary levels of upward departure.

people were present and there was relatively little potential for harm to others.  Mr. Rodriguez specifically chose times where it was unlikely that any person would be around.  In both instances, he watched, waited and did everything he could to make sure no one would be harmed.  In D.C., he even moved both the backpack and himself to ensure he had a clear view of any person or car approaching before he attempted to fire the weapon.  His goal was protest, a loud bang.  His intention was not to harm – and in fact, was to do everything he could to not harm.

## VI.    CONCLUSION

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Rodriguez respectfully requests that the Court impose a sentence of 7 years' incarceration.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

*/s/ Eugene Ohm*
Eugene Ohm
Diane Shrewsbury
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004

DAVID RODRIGUEZ ENCARNACION
100 Calle del Muelle
Apartment 1208
San Juan, PR 00901
(787) 775-5759